IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ARI GOLD,

                Plaintiff,

v.                                 CIVIL ACTION NO.   2:21-cv-00150

THOMAS JOYCE, et al.,

                Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants Thomas Joyce; Bobby McClung; Richard Goff; Jason Matthews; Shane Semones; John Does, 1, 2, and 3; and the City of Parkersburg's (collectively, "Defendants") Motion to Dismiss.  (ECF No. 5.)  For the reasons that follow, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

*I.     BACKGROUND*

This action arises out of an alleged administrative warrantless search of a private building located in Parkersburg, West Virginia.   Plaintiff Ari Gold ("Gold") is the chief executive officer and has a possessory interest in Emanuel's LLC, a Delaware limited liability company licensed to do business in the state of West Virginia.  (ECF No. 1 at ¶ 1.)  Gold is also an owner of the premises at 814-816 Market Street, Parkersburg, West Virginia (the "Premises").   (*Id.*) Defendant Mayor Thomas Joyce ("Mayor Joyce"), at all times relevant to this action, is the duly-elected mayor of the City of Parkersburg (the "City"), which is a political subdivision located in

the state of West Virginia.  (*Id.* at ¶¶ 2, 10.)   Defendant Bobby McClung ("McClung"), at all relevant times to this action, is employed as the Director of Code Administration for the City.  (*Id.* at ¶ 3.)   Defendant Richard Goff ("Goff"), at all times relevant to this action, is employed by the City as an Inspector for the Building and Zoning Office.  (*Id.* at ¶ 4.)   Defendant Jason Matthews ("Matthews"), at all times relevant to this action, is employed as the Fire Chief of the City of Parkersburg Fire Department.  (*Id.* at ¶ 5.)   Defendant Shane Semones ("Semones"), at all times relevant to this action, is employed a detective for the City of Parkersburg Police Department. (*Id.* at ¶ 6.)   Defendants John Does 1, 2, and 3 are employed as police officers with the Parkersburg Police Department, and their true identities are unknown at this time.  (*Id.* at ¶¶ 7–9.)

The Complaint alleges that in September 2020, Goff and Lieutenant Wayne White[1] of the City of Parkersburg Fire Department attempted to gain access to the Premises.  (*Id.* at ¶ 11.)   Gold owns a possessory interest in the Premises and is responsible for the maintenance and upkeep. (*Id.* at ¶ 12.)   Gold and his associates have access to the Premises, which is private and not open to the general public.  (*Id.*)   The ground floor is rented.  (*Id.*)   Entry to the second floor of the Premises is gained by a door on the ground level on the street-facing façade.  (*Id.*)

Instead of using this door, Goff and Lt. White crossed a private parking lot behind the Premises and climbed the fire escape to reach the second floor.  (*Id.* at ¶ 13.)   Gold alleges that they then entered the Premises to conduct a search.  (*Id.*)   Gold was present and asked the pair to produce an administrative warrant to search the Premises.  (*Id.* at ¶ 14.)   Goff allegedly claimed to have such a warrant, but then admitted that he did not possess a warrant when Gold asked him to produce it.  (*Id.*)   Gold refused to consent to a search and requested that Goff and Lt. White

---

[1] Lt. White is not a party to this action.

2

leave.   (*Id.* at ¶ 15.)   Gold asserts that he was "calm and cordial, but firm in his assertion of his rights," during this encounter.   (*Id.* at ¶ 15.)

Several months later, on February 26, 2021, Gold received a call from an independent contractor that Goff, McClung, Joyce, Semones, and John Does 1–3 were at the Premises demanding to search.[2]   (*Id.* at ¶ 16.)   At the time of the call, Gold was "hours away" and "driving."   (*Id.* at ¶ 18.)   The independent contractor then put Gold on speaker phone so that he could communicate directly with the Defendants.   (*Id.* at ¶ 16)   Gold asked Goff if he had a warrant, at which Goff allegedly responded that he was "not dealing with this guy," and handed the phone to Mayor Joyce.   (*Id.* at ¶ 17.)   Gold reiterated that he did not consent to a search and asked Mayor Joyce for a warrant.   (*Id.*)

While Gold remained on the phone with Mayor Joyce, Defendants allegedly told the independent contractors on site that they were not permitted to leave and were required to wait in the parking lot while a search was conducted.   (*Id.* at ¶¶ 21–22.)   Semones then led Goff, McClung, and Matthews up the fire escape to the second floor and opened the door.   (*Id.* at ¶ 23.)   Semones, Goff, McClung, and Matthews then walked inside to perform the search, while Gold remained on the phone with Mayor Joyce objecting to the search.   (*Id.* at ¶¶ 23–24.)

After the search, Semones then began to question the independent contractors as to their legal status to work in the United States, their employer, and how they were compensated for work performed, among other things, in an alleged attempt to illicit incriminating information.   (*Id.* at

---

[2] Gold alleges that, upon information and belief, Goff misrepresented the events in September 2020 by informing the other Defendants that "there was almost an altercation" between Gold and himself, which Gold alleges Goff used to justify the presence of the unnamed police officers.   (*Id.* at ¶¶ 19–20.)

¶¶ 27–28.)   Defendants allegedly informed the independent contractors that they "were in big trouble," and threatened them with fines and citations.   (*Id.* at ¶ 29.)

At some point, Gold asked Mayor Joyce what Defendants wanted him to do and offered to "obtain some sort of permit" from the "Building Department office" the following Monday.   (*Id.* at ¶ 30.)   Finding Gold's offer to be sufficient, Mayor Joyce called to the other Defendants, "Tell my guys to come down."   (*Id.* at ¶ 31.)   Goff, McClung, Matthews, and Semones then left the building.   (*Id.* at ¶ 32.)   At some unknown point, the three John Doe defendants left the scene. (*Id.* at ¶ 33.)

After Defendants exited the Premises, they remained on site after the search and informed Gold that they had contacted a Labor Inspector with the West Virginia Department of Labor and were waiting for her arrival.   (*Id.* at ¶ 34.)   Inspector Marla Neogra[3] subsequently arrived and spoke to Gold via telephone and spoke to the three independent contractors.   (*Id.* at ¶ 35.)   Gold "worked out" with Inspector Neogra what needed to be done to continue work on the Premises, as well as "acquiesced to her request" to provide the legal work status of the independent contractors and to obtain "basic training."   (*Id.* at ¶ 35.)   Inspector Neogra then spoke with Defendants, finished some paperwork related to her visit, and then all left the scene.   (*Id.* at ¶¶ 35–36.)

At some time immediately following this incident, McClung prepared a notice that they would be returning to conduct an additional search of the Premises on March 1, 2021, at 12:00 p.m., and delivered the notice to Gold's counsel.   (*Id.* at ¶ 37.)   Defendants were subsequently informed by Gold's counsel that they did not have Gold's consent to search on that date or at any time thereafter.   (*Id.* at ¶ 38.)

---

[3] Inspector Neogra is not a party to this suit.

4

Gold filed his Complaint in this Court on March 5, 2021. (ECF No. 1.) The Complaint asserts four causes of action: (I) Unreasonable search and seizure in violation of the Fourth Amendment and pursuant to 42 U.S.C. § 1983; (II) bystander liability; (III) supervisory liability pursuant to 42 U.S.C. § 1983; and (IV) state law negligence. (*See id.*)

Defendants filed the instant motion to dismiss on March 31, 2021. (ECF No. 5.) Gold timely responded in opposition to the motion on April 14. (ECF No. 7.) Defendants timely filed their reply on April 21. (ECF No. 8.) With the motion fully briefed, it is ripe for adjudication.

## II.    LEGAL STANDARD

A pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (stating that this requirement exists "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead enough facts "to state a claim to relief that is plausible on its face." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Stated another way, the factual allegations in the complaint "must be sufficient 'to raise a right to relief above the speculative level.'" *Woods v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do."

5

*Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. This Court then "assume[s] the[ ] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* "[T]o satisfy the plausibility standard, a plaintiff is not required to plead factual allegations in great detail, but the allegations must contain sufficient factual heft to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of that which is alleged." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (internal quotation marks omitted).

## III.    DISCUSSION

Defendants argue that each claim asserted against them is subject to dismissal. First, Defendants argue that Plaintiff's claims fail as no constitutional right was violated when they conducted an administrative search of the Premises. Next, Defendants argue that, alternatively, they are entitled to qualified immunity as they did not violate any of Gold's "clearly established Fourth Amendment rights." Then, Defendants argue that Gold has failed to sufficiently plead a supervisory liability claim against Joyce. Defendants next argue that the City cannot be held vicariously liable for the acts of its employees because the employees' actions were intentional. Finally, Defendants assert that Gold has failed to plead a cognizable claim of negligent supervision

and training because the Complaint alleges only intentional conduct.  The Court will consider each argument in turn.

### A.  Fourth Amendment Rights and Administrative Searches

The thrust of Defendants' first argument is simply that no violation of Gold's Fourth Amendment rights occurred because they were authorized by the laws of West Virginia to conduct inspections to "aid in the enforcement of any states' law or municipal ordinance."  (ECF No. 6 at 4–5.)  Defendants argue that administrative searches "are an exception to the Fourth Amendment's warrant requirement," and are instead governed by the Fourth Amendment's requirement for reasonableness.  (*Id.*)  Defendants assert that the search of the Premises was reasonable because West Virginia Code § 8-12-15 provides municipalities the authority to enter and inspect private properties to aid in the enforcement of West Virginia law or municipal ordinance.  (*Id.* at 7.)  Furthermore, Defendants argue that the City's ordinances also explicitly provide authority to permit both entry to and inspections of property.  (*Id.* at 7–8.)  Because both the City's ordinances and West Virginia law provide the authority, Defendants argue that no constitutional violation logically occurred.

Fourth Amendment protections against unreasonable search and seizure by the government apply to commercial premises.  *See v. City of Seattle*, 387 U.S. 541, 543 (1967).  This expectation of privacy exists with respect to traditional police searches conducted to gather evidence for criminal prosecution, but also with respect to administrative searches conducted in order to enforce regulatory statutes.  *Camara v. Municipal Court of City and Cnty. of San Francisco*, 387 U.S. 523, 528–29 (1967); *See*, 387 U.S. at 543.   "The businessman, too, has that [Fourth Amendment] right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be

made and enforced by the inspector in the field without official authority evidenced by warrant." *See*, 387 U.S. at 543.

Contrary to Defendants' position, administrative searches are generally subject to the Fourth Amendment's warrant requirement.   In *Camara*, the Supreme Court explained that "translation of the abstract prohibition against 'unreasonable searches and seizures" into workable guidelines," though difficult, has always resulted in one governing principle: "[A] search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."   *Camara*, 387 U.S. at 528–29.   The Court concluded that the Fourth Amendment extended the same protections to administrative searches as it did to searches for "evidence of criminal action."   *Id.* at 530.   In so holding, the Court recognized that while routine municipal fire, health, and housing inspection programs are "less hostile intrusion[s]," they are still "significant intrusions upon the interests protected by the Fourth Amendment."   *Id.* at 533. Having established that the Fourth Amendment protects against such routine inspections, the Court maintained that "reasonableness is still the ultimate standard," and that "[i]f a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant."   *Id.* at 539.

The Court, however, excluded from this general rule the problems of "licensing programs" requiring inspections, and instead left those to be resolved "on a case-by-case basis under the general Fourth Amendment standard of reasonableness."   *See*, 387 U.S. at 546.   Thus, the Court has carved out a few, narrow exceptions to this general rule, generally reserved to certain heavily-regulated industries where the government oversight is so extensive "that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise."   *See*

8

*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) (internal citation omitted).   Still, "[w]here Congress has authorized inspection but made no rules governing the procedure that inspectors must follow, the Fourth Amendment and its various restrictive rules apply."   *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970).

The decisions upon which Defendants rely to make their argument track these heavily-regulated carveouts.   *See New York v. Burger*, 482 U.S. 691 (1987) (warrantless search of automobile junkyard held reasonable under Fourth Amendment); *Donovan v. Dewey*, 452 U.S. 594 (1980) (warrantless inspections of underground and surface mines authorized by the Mine Safety and Health Act of 1977); *United States v. Biswell*, 406 U.S. 311 (1972) (warrantless search of firearm dealer's storeroom authorized by Gun Control Act of 1968); *Colonnade Catering Corp.*, 397 U.S. 72 (warrantless search of liquor storeroom authorized by tax statutes pertaining to retail dealers of liquor).   Defendants do not assert that they are engaged in a heavily-regulated industry where a warrantless search may be presumptively reasonable, thus this Court turns to the sources of Defendants' asserted authority to conduct such a warrantless administrative search.

West Virginia Code § 8-12-15 provides the following:

> The governing body of every municipality shall have plenary power and authority to provide for the entering and inspection of private premises to aid in the enforcement of any state law or municipal ordinance: Provided, That this section shall not be construed as purporting to authorize an unreasonable search and seizure prohibited by section 6, article III of the Constitution of this State.

Section 6, Article III of the West Virginia Constitution parallels the Fourth Amendment such that its protections are co-extensive with its federal counterpart.   *See State v. Clark*, 752 S.E.2d 907, 920 (W. Va. 2013); *Ullom v. Miller*, 705 S.E.2d 111, 117, n.4 (W. Va. 2010).   Even a cursory

glance at this authorizing statute would seemingly indicate the necessity of obtaining a search warrant before conducting an administrative search, undermining Defendants' argument.

Further undermining their argument is the very next section of West Virginia law:

(e) When a code enforcement agency official enters the premises of the property for investigating or inspecting any structure, dwelling, or building, the investigation shall be performed to minimize the inconvenience to the owner or persons in possession and shall be consistent with the following:

(1) Except in exigent circumstances and as permitted by law, the enforcement agency shall provide reasonable advance notice to the owner and request permission from the owner to enter the property;

(2) If the owner cannot be located after reasonable inquiry by the code enforcement agency as required by this section, *or if the owner refuses entry, the code enforcement agency may obtain an administrative search warrant from either the municipal court or the magistrate court* located in the jurisdiction of the municipality or county where the structure, dwelling, or building is located.  Before obtaining an administrative search warrant, a code enforcement agency official is required to make a sworn statement and prima facie case showing that the code enforcement agency was unable to gain access to the structure, dwelling, or building after reasonable and good faith efforts, and that there is a legitimate and substantial safety concern involving the structure, dwelling, or building that supports the requested entry[.]

W. Va. Code § 8-12-16(e) (emphasis added).  The statues and procedures relied upon by the Defendants directly call for the obtaining of a warrant when the owner of a property refuses entry to code enforcement officers.

Here, Gold has sufficiently alleged that Defendants did not obtain a search warrant after he refused their entry to search the Premises.   (ECF No. 1 at ¶¶ 17, 23–24.)   Gold has further alleged that, despite his refusal, Defendants nonetheless entered and searched the Premises.   (*Id.*)   Based on the authority above, Gold has sufficiently alleged that a constitutional violation occurred.

Therefore, for the foregoing reasons, Defendants' motion is **DENIED** as to Gold's claims pursuant to 42 U.S.C. § 1983.

### B.  Qualified Immunity

Defendants next argue that they are entitled to qualified immunity, as they did not violate any of Gold's clearly established Fourth Amendment rights in their search of the Premises.   (ECF No. 6 at 8–9.)   Defendants claim that they "are aware of no controlling authority in West Virginia that stands for the proposition that warrantless administrative searches under a valid Building Code inspection program are unconstitutional."   (*Id.* at 10.)

The purpose of qualified immunity is to ensure that government officials performing discretionary functions can perform their duties "free from the specter of endless and debilitating lawsuits." *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).   When performing discretionary functions, government officials are "entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rish v. Johnson*, 131 F.3d 1092, 1095 (4th Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

While a defendant may assert a qualified immunity defense through a Rule 12(b)(6) motion, "the defense faces a formidable hurdle" and "is usually not successful." *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 396 (4th Cir. 2014) (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)).   This is because, at this very early stage in the proceedings, dismissal under Rule 12(b)(6) is only appropriate if the plaintiff "fails to state a claim that is *plausible* on its face." *Id.* at 396 (quoting *Iqbal*, 556 U.S. at 678) (emphasis

11

in original).   When a defendant asserts the qualified immunity defense at this stage, the plaintiff's burden is to demonstrate that his  claim "satisfies the following two-prong test: '(1) the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known.'"  *Souk v. City of Mount Hope*, Civ. Action No. 2:14-cv-26442, 2015 WL 5698509 at *5 (S.D. W. Va. Sep. 28, 2015) (quoting *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013)).

The Supreme Court once required a district court to first address the threshold question of whether there was a constitutional violation alleged before turning to the second question of whether, if a violation was found, that the violation was of clearly established law.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).   Under the Supreme Court's more recent decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), however, a district court retains discretion in determining the order in which to address the two prongs of the qualified immunity inquiry.   In the present case, Defendants argue that, even if a constitutional violation occurred, said right was not clearly established.   As explained above, this Court has already determined that Gold has sufficiently alleged a constitutional violation.   Therefore, the Court addresses Defendant's assertion that this constitutional right was not clearly established.

"A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013).   However, it is unnecessary for the specific action and facts alleged to be held unlawful previously in order to constitute a clearly established right.  *H.H. ex rel. H.F. v. Moffett*, 335 Fed.Appx. 306, 314 (4th Cir. 2009).   Rather, the clearly

established element serves as "a notice-giving provision" that provides government officials with "fair warning" that conduct violates the Constitution.  *Souk*, 2015 WL 5698509 at *10.

The Court finds implausible Defendants' argument that the warrant requirement imposed by the Fourth Amendment is not clearly established.  First, as demonstrated above, there are decades of case law establishing that, absent few and narrow exceptions, the warrant requirement extends to administrative searches conducted by a code enforcement agency.  *Camara*, 387 U.S. at 533.

Indeed, the seminal case is similar to the facts alleged here.  In *Camara*, an inspector entered an apartment building in San Francisco to make a routine inspection of possible violations of the city's Housing Code.  *Id.* at 526.  The appellant, who leased the ground floor of the building, reportedly maintained a residence at the rear of the leasehold.  *Id.*  The inspector claimed that the building's occupancy permit did not allow for a ground-floor residence, and therefore demanded to inspect the appellant's leasehold.  *Id.*  The appellant refused and denied entry to the inspector because he lacked a search warrant.  *Id.*  Some time later, the inspector returned again to demand entry and inspection of the ground floor.  *Id.*  Again, the appellant refused and demanded a warrant.  *Id.*  Eventually, appellant was issued a citation by the city and pursuant to the Housing Code for denying the inspector entrance to his leasehold.  *Id.*

The Supreme Court, in reasoning that the Fourth Amendment extends to commercial properties and administrative searches as explained above, found that the subsequent citation was unconstitutional.  *Id.* at 540.  "[A]s a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should normally be sought only after entry is refused."  *Id.* at 539.  Indeed, the Court noted that no

13

emergency situation existed which would demand immediate access, and the inspector in fact made three trips to the building to gain consent to search, all without obtaining the appropriate warrant. *Id.* The Court concluded that the "appellant had a constitutional right to insist that the inspectors obtain a warrant to search and that [the] appellant [could] not constitutionally be convicted for refusing to consent to the inspection." *Id.* at 540.

Defendants' assertion is further eroded by the very statutes they cite to justify their alleged entry. As noted above, the provisions of West Virginia Code § 8-12-15 allows for the entry and inspection of properties so long as the search does not run afoul of Section 6, Article III, West Virginia's equivalent to the Fourth Amendment. Moreover, West Virginia Code § 8-12-16(e) directs the inspector to obtain a warrant once he is denied entry by the owner. With several statutes directing the obtainment of a warrant, along with decades of precedent establishing the necessity of a warrant for administrative searches, Defendants' argument that they remained unaware of any controlling authority requiring a warrant falls well short of the mark.

Gold's complaint sufficiently alleges that he refused entry to the inspectors, that the inspectors lacked a warrant, and that the inspectors entered and searched the premises anyway. (ECF No. 1 at ¶¶ 17, 23–24.) Furthermore, the right to be free from unreasonable searches, including administrative searches, is clearly established such that Defendants knew or should have known that the search required a warrant absent consent. Because Gold has sufficiently alleged that a constitutional violation occurred and that the constitutional right was clearly established, Defendants are not entitled to qualified immunity at this juncture.

Therefore, for the foregoing reasons, Defendants' motion is **DENIED** as it relates to qualified immunity.

14

C.  *Supervisory Liability*

Defendants next argue that Gold has failed to sufficiently plead a claim of supervisory liability against Mayor Joyce.  (ECF No. 6 at 11.)  Defendants assert that neither the Supreme Court of the United States nor the Supreme Court of Appeals of West Virginia has recognized that a supervisor may be held liable for the constitutional violations committed by employees without an independent violation committed by the supervisor himself.  (*Id.* at 12.)  Gold, however, argues that instead of being tied to a § 1983 claim, West Virginia recognizes such claims as "grounded in state law and distinct from claims asserted under 42 U.S.C. § 1983," and are guided by negligence principle.  (ECF No. 7 at 14.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.* . . . Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the officials own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009); *see also Trulock v. Freeh,* 275 F.3d 391, 402 (4th Cir.2001), *cert. denied,* 537 U.S. 1045 (2002) ("In a *Bivens* suit there is no *respondeat superior* liability. . . . Instead, liability is personal, based upon each defendant's own constitutional violations." (citation omitted)); *Monell v. Department of Social Services of the City of NY,* 436 U.S. 658, 694 (1978) ("the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability").

However, liability may be premised "on a recognition that supervisory indifference or 'tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  *Slakan v. Porter,* 737 F.2d 368, 372 (4th

Cir.1984), *cert. denied,* 470 U.S. 1035 (1985).   To establish liability under § 1983 for a supervisory defendant, the plaintiff must establish the following:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).   *See also Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) (finding a plaintiff may succeed in a supervisory liability claim under § 1983 by demonstrating (1) that the defendant promulgated, created, implemented, or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation).

Thus, the question is whether Gold has sufficiently pled each of the *Shaw* elements.   After careful consideration of the allegations in the Complaint, the Court is satisfied that Gold has met this standard, albeit only just.   Specifically, Gold has pled that Mayor Joyce was physically present at the Premises and supervising the other Defendants.   (ECF No. 1 at ¶¶ 16–17, 21, 24, 30–31.)   Gold has also pled that Mayor Joyce directed at least some of the Defendants' actions while on site.   (*Id.* at ¶ 16–17, 21, 24, 30–31, 61.)   Finally, Gold has pled that there was an affirmative causal link between Mayor Joyce's actions and the particular constitutional injury suffered.   (*Id.*)   Therefore, at this juncture, the Court finds that Gold has sufficiently pled an action for supervisory liability.

For the foregoing reasons, Defendants' motion is **DENIED** as to Gold's claim of supervisory liability pursuant to 42 U.S.C. § 1983.

### D.  Vicarious Liability of the City of Parkersburg

Next, Defendants argue that the City of Parkersburg cannot be vicariously liable for the intentional actions of the individual Defendants pursuant to W. Va. Code § 29-12A-4(c)(2).   (ECF No. 6 at 12–13.)   Gold responds that he has alleged "sufficient facts, that if taken as true, would impugn liability to the [C]ity."   (ECF No. 7 at 15.)   Gold also asserts that "further discovery" would illuminate the Defendants' subjective intentions, as well as the City's "customs, policies, and training," as well as "any record of individual Defendants' propensities and prior acts."   (*Id.* at 14.)

Under the West Virginia Governmental Tort Claims and Insurance Reform Act (the "Act"), a political subdivision cannot be held liable for any act or omission by an employee in connection with a government or proprietary function, except in five instances.  W. Va. Code § 29-12A-4. Under the Act, a political subdivision can be held liable for only the following specific acts: (1) negligent operation of any vehicle by employees within the scope of employment; (2) negligent performance of acts by employees while acting within the scope of employment; (3) negligent maintenance of roads, sidewalks, and other similar pathways; (4) negligent act of an employee on political subdivision property; or (5) any other act in which liability is specifically imposed on the political subdivision by another section of the West Virginia Code.  W. Va. Code § 29-12A-4(c).

By the express terms of the Act, a political subdivision cannot be held liable for its employees' intentional malfeasance.  *See Mallamo v. Town of Rivesville*, 477 S.E.2d 525, 533–34 (W. Va. 1996) ("In that conspiracy is an intentional act, not a negligent one, the Town of

Rivesville would not be liable for any intentional malfeasance on the part of Wilson."). "[C]laims of intentional and malicious acts are included in the general grant of immunity in W. Va. Code, 29–12A–4(b)(1)." *Zirkle v. Elkins Road Public Serv. Dist.*, 655 S.E.2d 155, 160 (W. Va. 2007).

Gold has not provided any argument or authority that a warrantless search amounts to negligent, as opposed to intentional, conduct. As this Court and others have repeatedly held, a plaintiff "[cannot] prevail on a claim of simple negligence based on [a defendant's] intentional act." *Smith v. Lusk*, 533 F. App'x 280, 284 (4th Cir. 2013) (citing *Stone v. Rudolph*, 32 S.E.2d 742, 748 (W. Va. 1944) (noting that "intentional acts are not encompassed by general negligence principles")); *Taylor v. Clay Cnty. Sheriff's Dept.*, Civ. Action No. 2:19-cv-00387, 2020 WL 890247 at *6 (S.D. W. Va. Feb. 24, 2020); *Weigle v. Pifer*, 139 F. Supp. 3d 760, 780 (S.D. W. Va. 2015) ("A mere allegation of negligence does not turn an intentional tort into negligent conduct."). "Conduct that supports a negligence claim can be distinguished from conduct that supports an intentional tort claim by examining the subjective intent of the alleged tortfeasor." *Weigle*, 139 F.Supp.3d at 780.

While Gold claims that "[w]ithout further discovery, it is impossible to surmise the subjective intent of the individual Defendants," in actuality, Gold's claim fails because of what has been factually alleged. Despite Count IV being couched in terms of negligence, Gold's factual allegations belie his claim of negligence. *Id.* (quoting *Benavidez v. United States*, 177 F.3d 927, 931 (10th Cir. 1999) ("However, 'a mere allegation of negligence does not turn an intentional tort into negligent conduct.'")). Factually, what Gold has alleged is an unreasonable, warrantless search of his Premises. Under the Fourth Amendment, this is intentional conduct. *See Rhodes v. King*, Civ. Action No. 2:19-cv-00626, 2020 WL 4607323 at *4 (S.D. W. Va. Aug.

11, 2020); *Taylor*, 2020 WL 890247 at *7 (finding that plaintiff's claim of negligence subject to dismissal when it relied on the same alleged facts to support a claim for unlawful search under § 1983).   Gold's allegations indicate that the individual Defendants intended the consequences of their actions, meaning that Defendants' efforts were undertaken for the purpose of searching the Premises.   Therefore, while these allegations may support a claim for unreasonable search under § 1983, they cannot support liability predicated on negligence.   Because the allegations cannot support a claim of negligence, the City cannot be held vicariously liable pursuant to the Act. Moreover, and as further explained below, Count IV would still be subject to dismissal absent this finding.

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** as to Count IV of this action.

### E.   Negligent Supervision and Training

Even if the Court were to find that the City is not immune from Gold's negligence claims, which it does not, Defendants argue that Gold has failed to sufficiently plead that the City negligently trained and supervised its employees because Gold has only plead that the City's employees acted intentionally.   (ECF No. 6 at 13.)   Defendants assert that West Virginia law requires a separate finding of negligence to support a negligent training and supervision claim, which Gold has not pled in the complaint.   (*Id.* at 13–14.)   Gold argues that the alleged facts, if taken as true, would impugn liability to the City.   (ECF No. 7 at 15.)   Further, Gold asserts that without further discovery, "it is impossible to surmise the subjective intent of the individual Defendants," and therefore Gold cannot know whether the Defendants knowingly violated his rights or whether the Defendants were simply incompetent.   (*Id.* at 15–16.)

First, despite Count IV being labeled as a "State Law Negligence Claim," Gold goes on to allege that "Defendants relied on their training and supervision by the City of Parkersburg, which fell below the reasonable standard of care by disregarding Plaintiff's Fourth Amendment rights." (ECF No. 1 at ¶ 66.)   Gold further alleges that Defendants were "undertrained," and that "[u]pon information and belief, [] the City of Parkersburg profits" from the Defendants' actions through fines and citations stemming from these searches, and therefore establishes an "official policy" of the City.   (*Id.*)

In *Lane v. Fayette County Commission*, Judge Copenhaver explained that establishing a state-law claim for negligent training and supervision is different than that of 42 U.S.C. § 1983 claim.   Civ. Action No. 2:18-cv-1223, 2019 WL 4780815 at *5 (S.D. W. Va. Sep. 30, 2019). Rather than showing "deliberate indifference" or a widespread custom or policy, the plaintiff must show that "the employer was on notice of the employee's propensity (creating a duty), yet unreasonably failed to take action (manifesting a breach), resulting in harm to a third-party from the employee's tortious conduct."   *Id.* (quoting *S.R. v. Fayette Cty. Bd. of Educ.*, Civ. Action No. 2:15-cv-13466, 2016 WL 6886868 at *6 (S.D. W. Va. Nov. 21, 2016)).   *See also Gaylord v. City of Beckley, West Virginia*, Civ. Action No. 5:18-cv-00177, 2018 WL 3581093 at *5 (S.D. W. Va. July 25, 2018) ("Under West Virginia law, to state a claim for negligent supervision or training, a Plaintiff must show that '[a municipal defendant] failed to properly supervise [an employee officer] and, as a result, [the employee officer] proximately caused injury to the [plaintiff].'").

As explained above, Gold has failed to sufficiently plead a cause of action based in negligence because he has only alleged intentional conduct.   *See Selders v. MegaCorp Logistics, LLC*, Civ. Action No. 2:14-CV-60, 2014 WL 12638026 at *1 (N.D. W. Va. Dec. 22, 2014)

20

(dismissing negligent supervision and training claim based on allegations of intentional torts) (citing *Taylor v. Cabell Huntington Hosp., Inc.*, 538 S.E.2d 719, 725 (W. Va. 2000)).  Gold, however, has also failed to allege the core elements of the claim, namely that the City was on notice of any of the individual Defendants' propensities and that it unreasonably failed to take action.  Even taking Gold's allegations as true, he has only alleged that "upon information and belief" the City is engaging in a scheme whereby it profits from the imposition of fines, but Gold has failed to allege any facts that would support this conclusion.  *See Myers v. City of Charleston*, Civ. Acion No. 2:19-cv-00757, 2020 WL 4195005 at *14 (S.D. W. Va. July 21, 2020).

Therefore, for the foregoing reasons, Defendants' motion is **GRANTED** as to Count IV. Count IV is hereby **DISMISSED**.

### IV.    CONCLUSION

For the reasons more fully discussed above, Defendants' Motion to Dismiss, (ECF No. 5), is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        June 24, 2021

THOMAS E. JOHNSTON, CHIEF JUDGE

21